UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

KATHLEEN VIOLETTE,

                     Plaintiff,                      **COMPLAINT**

    -against-                                 **Case No.:**

STX COMMODITIES, LLC and STX GROUP B.V.,

                    Defendants.
------------------------------------------------------------------x

## JURY TRIAL DEMANDED

### COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, KATHLEEN VIOLETTE (hereinafter referred to as "Plaintiff" or "Ms. Violette"), by and through her undersigned counsel, RISMAN & RISMAN, P.C., as and for her Complaint in this action against Defendants STX COMMODITIES, LLC, and STX GROUP B.V. ("hereinafter collectively referred to as "Defendants" or "STX"), hereby alleges as follows:

### NATURE OF ACTION

1.      Plaintiff brings suit to redress the violation of her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"), the New York State Human Rights Law, New York Executive Law § 292 ("NYSHRL"), and the New York City Human Rights Law, Administrative Code of the City of New York §§8-101 et seq. ("NYCHRL").

### PRELIMINARY STATEMENT

2.      Defendant STX Commodities, LLC is a New York based environmental commodity trading company with an office location in New York City.

3.      Defendant STX B.V. is the parent company of STX Commodities, LLC.

4.      Ms. Violette was an employee of Defendants as a Marketing and Communications Manager, from June 20, 2023 to January 3, 2025.

5.      Throughout her employment with Defendants, Ms. Violette was subjected to abhorrent sexual harassment, as well as discrimination based on her national origin, gender, and disability, a failure to reasonably accommodate her disabilities, and retaliation for her complaints of sexual harassment and discrimination and for her request for accommodation for her disabilities.

6.      When Ms. Violette complained to Human Resources, the investigation into her complaints was illusory, and she was retaliated against and terminated from her employment soon thereafter.

7.      Rather than meaningfully address Ms. Violette's concerns and create a workplace free from sexual harassment and discrimination, Defendants terminated Ms. Violette from her employment – punishing the victim while protecting her alleged harassers.

8.      Defendants' discriminatory conduct was willful, malicious and wanton, warranting an award of punitive damages. Such conduct has caused, and continues to cause, Ms. Violette to suffer substantial monetary damages, permanent harm to her professional and personal reputation and/or severe mental anguish and emotional distress.


## JURISDICTION AND VENUE

9.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights under Title VII and the ADA.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).

10.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

11.      Additionally, venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendant STX Commodities, LLC maintains a principal place of business in this district at 11 Times Square, 31st Floor, New York, New York 10036. Furthermore, during the time that Ms. Violette worked for Defendants, she worked out of the STX Commodities, LLC office location at 11 Times Square, 31st Floor, New York, New York 10036.

12.      Ms. Violette filed a timely charge of gender, disability, and national origin discrimination, and sexual harassment with the EEOC, and has received a Notice of Right to Sue from the EEOC within the past 90 days, which was issued on September 22, 2025. This Complaint has been filed within 90 days of Plaintiff's receipt of her right to sue notice from the EEOC.

13.      Prior to the commencement of this action, a copy of Plaintiff's Complaint was served on both the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

14.       Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

**Ms. Violette:**

15.      Ms. Violette, at all relevant times, was and still is an individual and is now, and at all times mentioned in this Complaint, a resident of New York, New York.

16.      At all relevant times, Ms. Violette met the definition of an "employee" of the Defendants, each of them individually and collectively, under all applicable statutes.

17.      At all relevant times, Ms. Violette worked at the STX Commodities, LLC office location at 11 Times Square, 31st Floor, New York, New York 10036.

18.      On or around June 20, 2023, Ms. Violette began her employment with Defendants as a Marketing and Communications Manager.

19.      As a Marketing and Communications Manager, Ms. Violette was supervised by Rocio

Ramirez Llopis, Marketing Lead/Head of Demand Generation ("Ms. Llopis"), and Werner Schoeman, Global Head of Marketing ("Mr. Shoeman").

20.    At all relevant times, Ms. Violette was a qualified candidate to perform her functions as a Marketing and Communications Manager.

21.    As detailed herein, on or around January 3, 2025, Ms. Violette was unlawfully terminated from her employment with Defendants.

22.    At all relevant times, Ms. Violette was, and still is, entitled to the equal benefit and protection of the Federal, State and City laws of the State of New York, and to establish civil rights to which she was, and is, entitled to under the Law.

**STX Commodities, LLC:**

23.    Upon information and belief, Defendant STX Commodities, LLC ("STX Commodities") is a limited liability company organized under the laws of Delaware, authorized to do business in the State of New York, with its principal place of business located at 11 Times Square, 31st Floor, New York, New York 10036.

24.    At all relevant times, STX Commodities regularly conducted and continues to conduct business in the State of New York and meets the definition of an "employer" under all applicable statutes.

25.    At all relevant times, STX Commodities was the employer of Ms. Violette under all applicable statutes.

26.    At all relevant times, STX Commodities had fifteen (15) or more persons in its employ under all applicable statutes.

27.    Upon information and belief, STX Commodities can sue and be sued.

**STX Group B.V.:**

28.     Upon information and belief, Defendant STX Group B.V. ("STX Group") is a foreign corporation organized under the laws of the Netherlands.

29.     Upon information and belief, STX Group is the parent company of STX Commodities and exercises substantial control over STX Commodities' operations, including maintaining direct supervisory authority over STX Commodities employees.

30.     At all relevant times, STX Group regularly conducted and continues to conduct business in the State of New York through its subsidiary STX Commodities, and meets the definition of an "employer" under all applicable statutes.

31.     At all relevant times, STX Group was the employer of Ms. Violette under all applicable statutes.

32.     At all relevant times, STX Group was the employer of STX Commodities employees under all applicable statutes.

33.     At all relevant times, STX Group had fifteen (15) or more persons working in the United States in its employ under all applicable statutes.

34.     Upon information and belief, STX Group can sue and be sued.

**STX Commodities and STX Group as Joint Employers:**

35.     At all relevant times, Defendants were joint employers of Ms. Violette.

36.     STX Commodities supervised Ms. Violette in the performance of her duties, determined her wages, benefits, and other compensation, determined her hours of work and scheduling, assigned her duties to be performed, was authorized to fire and discipline Ms. Violette, and had the right to control the means and manner of Ms. Violette's performance.

37.     STX Group supervised Ms. Violette in the performance of her duties, determined her wages, benefits, and other compensation, determined her hours of work and scheduling, assigned her

duties to be performed, was authorized to fire and discipline Ms. Violette, and had the right to control the means and manner of Ms. Violette's performance.

38.     Defendants collectively controlled the operations of the employees of STX Commodities, including Ms. Violette, through their interrelation of operations, control over the employment opportunities and the employment characteristics of the employees of STX Commodities, and control of hiring and/or firing of the employees of STX Commodities.

39.     Upon information and belief, Defendants collectively controlled the terms and conditions of employment of the employees working at STX Commodities, supervised and/or controlled work schedules, and set pay rates for employees working at STX Commodities.

40.     At all relevant times, Defendants collectively also had and have control over day- to-day operations at STX Commodities and have an interrelation of operations, had direct control over the employees employed at STX Commodities, authority over management, supervision, and oversight of the affairs, operation, and control of STX Commodities and had and have an active role in decision-making at STX Commodities.

41.     At all relevant times, Defendants collectively had interrelated operations, centralized control of labor relations, common management, and common ownership and/or financial control.

42.     At all relevant times, upon information and belief, STX Group fully owned its American subsidiary STX Commodities, and provided centralized functions such as back office, finance, risk, and legal and compliance for the subsidiary.

43.     At all relevant times, Defendants had fifteen (15) or more persons in their employ, each of them individually and collectively under all applicable statutes.

## **FACTUAL ALLEGATIONS**

44.     Ms. Violette began her employment with Defendants on June 20, 2023, as a Marketing and Communications Manager.

45.     Throughout her employment, Ms. Violette reported directly to Rocio Ramirez Llopis, Marketing Lead/Head of Demand Generation, who was based in Madrid, and reported indirectly to Werner Schoeman, Global Head of Marketing, who was based in Amsterdam.

46.     From the outset of her employment, Ms. Violette performed her job duties competently and professionally, meeting or exceeding all reasonable expectations of her position.

47.     Beginning in Fall 2023, Ms. Violette became the target of severe and pervasive sexual harassment and discrimination by multiple male employees at STX Commodities.

48.     In or around Fall 2023, during a company offsite event, Keegan Dean ("Mr. Dean"), a Senior Corporate Account Manager, sexually assaulted Ms. Violette on a company charter bus. Mr. Dean repeatedly and progressively groped Ms. Violette while making explicit comments about his high-ranking status in the company, claiming he was "untouchable," that "rules don't apply" to him, and that he "couldn't be fired," as well as stating that he wanted the power dynamic of being able to give Ms. Violette feedback on her work, alluding to seeking sexual pleasure from having control over her career, or words to that effect. Despite Ms. Violette's clear and consistent rejections of his advances, Mr. Dean persisted, at one point stating, "I want to put my hands all over your body." When Ms. Violette expressed her discomfort and dissatisfaction with his behavior, Mr. Dean issued an ultimatum, saying, "You have 20 seconds to tell me where I can put my hands on you, or I'm going to the back of the bus to hang out with my friends." Ms. Violette, feeling trapped and vulnerable in the window seat, told Mr. Dean he could leave, which he eventually did. However, upon arrival at the company hotel, Mr. Dean returned to Ms. Violette's seat, attempting to continue his unwanted interaction.

49.     During the same Fall 2023 offsite event, the day after Ms. Violette was sexually assaulted by Mr. Dean, Shane Mulqueen ("Mr. Mulqueen"), an Environmental Commodities Trader, sexually assaulted Ms. Violette in a vehicle. Mr. Mulqueen inappropriately and non-consensually groped Ms. Violette while she was seated between two male colleagues, leaving her physically unable to move away or use her arms during the car ride. Upon returning to the company hotel, despite Ms. Violette's attempts

to flee, Mr. Mulqueen pursued her due to delays with the elevators, in front of another male colleague. Mr. Mulqueen, who held a senior position, failed to select a floor in the elevator and refused to respond to inquiries from Ms. Violette and the other male colleague regarding this omission. When the elevator reached Ms. Violette's floor, she sprinted from the elevator, fearing Mr. Mulqueen would follow her to her hotel room. Ms. Violette overheard the other male colleague questioning Mr. Mulqueen about his intentions as he attempted to pursue Ms. Violette. This incident left Ms. Violette feeling threatened, unsafe, and vulnerable within her work environment, particularly given Mr. Mulqueen's senior status within the company.

50.    On multiple occasions after the offsite event, Mr. Dean continued to sexually harass Ms. Violette, making flirtatious comments inquiring about her bed in her hotel rooms and other similar comments suggesting an attempt to gain access to Ms. Violette's hotel rooms, and requested that Ms. Violette accompany him to various conferences to "babysit" him, despite that there was no business reason for Mr. Violette to attend such conferences.

51.    Throughout her employment, Ms. Violette was subjected to ongoing sexual harassment and/or gender discrimination from various male colleagues, including but not limited to Harrison Wittenberg ("Mr. Wittenberg") (Senior Corporate Account Manager/Head of Tax Credits) and Fabian Roobek ("Mr. Roobek") (Head of New Business Development/Managing Director), and Nick Masius ("Mr. Masius") (Head of Digital Marketing). Notably, upon information and belief, following Ms. Violette's complaints of sexual harassment and discrimination detailed herein, Mr. Wittenberg, Mr. Roobek, and Mr. Masius were promoted and/or were provided with a direct report.

52.    In or around Summer 2023 and Fall 2023, Mr. Masius made disparaging remarks about Ms. Violette's cognitive abilities on multiple occasions, referring to her "little lady brain" in connection to her gender.

53.    Throughout her employment, but primarily in 2024, Mr. Wittenberg repeatedly made inappropriate sexual comments to Ms. Violette, for example, regarding his preference for "bedroom

pilates," and on one occasion made inappropriate physical adjustments to his lower body region during conversations with Ms. Violette and inquired about her residential address in a manner that conveyed unusual interest and remarked that he lived nearby.

54.     Throughout her employment, but primarily in or around Fall 2024, Mr. Roobeek, Head of New Business Development, persistently made excessive and unwanted "compliments" to Ms. Violette, to the point of making her uncomfortable. Additionally, on one occasion, Mr. Roobeek verbally called to Ms. Violette over five times through a restroom door while she was in a vulnerable position, causing her to fear for her safety.

55.     These incidents created a hostile work environment for Ms. Violette and demonstrated a pattern of gender-based harassment and discrimination by senior male colleagues.

56.     In addition to the sexual harassment, hostile work environment, and gender discrimination described herein, Ms. Violette experienced discrimination based on her national origin. In or around Fall and/or Winter 2023, in the context of Ms. Violette relaying the U.S. office's feedback on an employee branding campaign which did not feature any U.S. team members, Mr. Schoeman stated to Ms. Violette that "Americans are all complainers," meaning people from the United States. Mr. Schoeman further stated to Ms. Violette on numerous occasions his belief that Americans are difficult, argumentative, and stubborn. Because Mr. Schoeman is South African and resides in the Netherlands, and other managerial employees of Defendants, and in particular the employees involved in the subsequent decision to terminate Ms. Violette, are of European nationality, and Mr. Schoeman was aware that Ms. Violette was American, these discriminatory remarks were clearly made in reference to Ms. Violette.

57.     In or around October 2023, Ms. Violette in detail reported these incidents to her direct supervisor, Ms. Llopis, during a conversation via Teams call. In discussing Ms. Violette's mid-year 2023 performance review, which was otherwise positive, Ms. Llopis informed Ms. Violette that she had received negative performance feedback from Mr. Dean, to which Ms. Violette explained that she had been following the instructions of Ms. Llopis herself in these instances, and Ms. Llopis acknowledged that

Ms. Violette's conduct had been proper. Furthermore, later that same day, Ms. Violette further informed Ms. Llopis of the sexual assault she had experienced by Mr. Dean in particular, as well as the other incident of harassment and discrimination by another senior male colleague, referring to the incident of harassment and discrimination by Mr. Mulqueen, detailed above. In response, without inquiring further, Ms. Llopis asked Ms. Violette whether she wanted to go to Human Resources, to which Ms. Violette responded that she feared retaliation if she went to Human Resources and noted that Carly Luck (at that time a Human Resources ("HR") Advisor acting as the Head of US HR) ("Ms. Luck"), was known to be close friends with Mr. Dean, one of her harassers. Ms. Llopis then stated that either Ms. Violette herself should raise this issue to Mr. Dean's manager, Austin Wentworth, or Ms. Llopis would do so herself.

58.    Ms. Llopis failed to take any meaningful action to address the sexual assaults or protect Ms. Violette from further harassment.

59.    In Winter 2024, during a one-on-one conversation regarding survey results, Ms. Violette informed Ms. Luck that she had experienced harassment, assault, and discrimination in the workplace. Ms. Luck thanked Ms. Violette for sharing this information, and stated that she would "quit her job" if she found out that Defendants were the kind of company that would cover up assault and sexual harassment.  Strangely, upon information and belief, Ms. Luck did not initiate any investigation into Ms. Violette's complaints.

60.    On March 7, 2024, during a women's day event with all of Defendants' female employees in the New York City Office, Ms. Luck asked Ms. Violette to share her experiences, to which Ms. Violette informed the entire group, including Ms. Luck and Lieske Bijlsma (Head of U.S. Operations) ("Ms. Bijlsma"), that she had experienced and was continuing to experience harassment, assault, and discrimination in the workplace, and that she feared retaliation for her complaints. Ms. Violette further disclosed that she felt that Defendants' workplace culture was such that reporting her complaints to HR would not make a difference.

61.    During these interactions, Ms. Violette reported that she had "experienced sexual

harassment," "been assaulted," was "continuing to face discrimination based on gender and nationality," had "been inappropriately touched by colleagues," had "been offered private product sessions with male colleagues," and had experienced "demeaning comments from male colleagues."

62.    Despite being made aware of these serious allegations, Defendants did not take any meaningful action to investigate or address Ms. Violette's concerns, demonstrating a pattern of deliberate indifference to her complaints.

63.    In fact, during the women's day event, Ms. Bijlsma stated that retaliation does not exist, or words to that effect, and indicated that Ms. Violette was crazy for fearing retaliation for her complaints of harassment, assault, and discrimination.

64.    Additionally, in or around Spring 2024, Ms. Violette discovered that Mr. Wittenberg had, unsolicited, shared with a female colleague inappropriate sexual text messages between himself and a client, further contributing to the hostile work environment.

65.    During a team offsite in Spring 2024, Mr. Schoeman acted aggressively toward Ms. Violette while Ms. Violette was conducting a presentation: Mr. Schoeman struck the conference room table with his hands while Ms. Violette was conducting a presentation, stating "you ruined today," because he had informed Ms. Violette last-minute that her presentation had to be cut from 1 hour to 30 minutes due to a male colleague's presentation exceeding his allotted time, and while Ms. Violette attempted to limit the length of her presentation, Ms. Schoeman had interrupted and asked questions, extending the time past 30 minutes.

66.    The day after this incident, Ms. Schoeman requested that Ms. Violette attend a 1:1 meeting during which Mr. Schoeman made discriminatory remarks about Americans and Ms. Violette's nationality as an American, including that "Americans are difficult and aggressive," and that Ms. Violette was "a difficult person."

67.    During other company events, Ms. Violette experienced negative sentiments from additional European colleagues regarding her American nationality, which contributed to her feeling

uncomfortable seeking assistance during instances of harassment.

68.     The discriminatory treatment based on her national origin was part of a broader pattern of hostile behavior by Defendants and materially affected Ms. Violette's working conditions.

69.     Ms. Violette was subjected to aggressive behavior from Mr. Schoeman, having her work undermined, and faced disparate treatment compared to non-American employees of Defendants. For example, when Ms. Violette shared her experiences and/or thoughts, Mr. Schoeman consistently argued that Ms. Violette was wrong, often in front of other team members.

70.     Team members stated to Ms. Violette that the way Mr. Schoeman treated Ms. Violette was noticeably different than the way Mr. Schoeman treated other team members, further evidencing the disparate treatment Ms. Violette experienced compared to non-American employees.

71.     During the same team offsite to Madrid in Spring 2024 described above, Ms. Violette raised concerns about her mental health and the harassment, hostile work environment, and discrimination to Ms. Llopis again. Ms. Violette disclosed that she was having a hard time dealing with the harassment and discrimination she had experienced and was continuing to experience. In response, Ms. Llopis told Ms. Violette to "develop a thicker skin" as that is what Ms. Llopis herself had done to cope with the difficult work culture at Defendants based on her gender, rather than providing appropriate support or intervention. Ms. Llopis further advised Ms. Violette to tell the harasser "to just fuck off," and noted "that is what [another female employee supervised by Ms. Llopis] does when they're out," minimizing Ms. Violette's experience of being sexually harassed and indicating that such behavior was both known about and tolerated by Defendants. During this conversation, Ms. Llopis informed Ms. Violette that she could speak to HR, and Ms. Violette stated that she was hesitant to formally go to HR with her concerns because she feared retaliation, and because Ms. Luck was known to be close friends with Mr. Dean, one of her harassers, as well as because Mr. Dean was a top salesperson.

72.     In or around October 2024, Ms. Violette complained to Ms. Llopis regarding the harassment, hostile work environment, and discrimination for a third time, and told Ms. Llopis that she

was considering making a formal complaint to HR due to the increasingly hostile work environment she had been enduring in September 2024. Ms. Llopis came off as dismissive and changed the subject.

73.     Throughout Summer and Fall 2024, the hostile work environment intensified, with management displaying increasingly aggressive behavior toward Ms. Violette and dismissing her legitimate concerns about workplace burnout. When Ms. Violette brought her concerns to Ms. Llopis, Ms. Llopis and Mr. Schoeman told Ms. Violette that she could not be feeling burnt out, and did not deserve to be burnt out, because everyone else on the team performed better and did more work than Ms. Violette did, gaslighting her. When Ms. Violette disclosed that she had to visit an emergency clinic due to her chest pains, a symptom of her emotional distress caused by the ongoing mistreatment she was enduring at work, Ms. Llopis and Mr. Schoeman made inappropriate and invasive requests for Ms. Violette's personal health information, further contributing to the discriminatory treatment she experienced. Thereafter, Mr. Schoeman continued to check in with Ms. Violette, during which Mr. Schoeman continued to negate Ms. Violette's experiences. When Ms. Violette explained that she was being required to perform additional work outside her job duties regarding commercial strategy, since this work was necessary for Ms. Violette to perform her job and no one else was doing this work, Mr. Schoeman and Ms. Llopis initially criticized Ms. Violette for spending time on tasks outside the scope of her role, but, contradictorily, Mr. Schoeman subsequently stated, in front of other managers including Ms. Bijlsma, that this work was within the scope of Ms. Violette's role, portraying Ms. Violette as being unaware of her job requirements and gaslighting her feelings of burnout.

74.     On October 8, 2024, Ms. Violette made a complaint to Ms. Luck regarding the sexual harassment, discrimination based on both gender and national origin, and hostile work environment she had endured.

75.     On October 11, 2024, Ms. Violette submitted to Ms. Luck a detailed 13-page document with additional allegations expanding upon her initial complaint. In response, Ms. Luck stated that she "cried multiple times" and that her mouth was hanging open while reading Ms. Violette's 13-page

document.

76.     Following her formal complaint, Ms. Violette participated in multiple meetings with Ms. Luck throughout October and November 2024, providing specific details and witness information to support her claims. Ms. Bijlsma also joined some of these meetings, despite that Ms. Bijlsma was not an HR employee nor was she Ms. Violette's supervisor. During these meetings, Ms. Bijlsma frequently negated Ms. Violette's experiences and/or argued with Ms. Violette about what she was experiencing.

77.     On multiple occasions following Ms. Violette's formal complaint, Ms. Luck stated that Ms. Violette was in a mentally and physically unsafe environment and management structure and that immediate action needed to be taken to address the issues she was complaining about. However, as detailed below, this did not occur.

78.     On October 29, 2024, despite her pending harassment, hostile work environment, and discrimination complaint, Ms. Violette was subjected to a mid-year review that appeared designed to create a negative record of her performance. The mid-year review indicated that Ms. Violette had failed to meet quantitative goals, when this was not the case, as no quantitative goals had been communicated to her beforehand, nor were any quantitative goals set forth in her Key Performance Indicator (KPI) document. The mid-year review further criticized Ms. Violette for focusing on work that was not part of her job, despite that Ms. Violette had made Defendants aware that she was being required to perform work that was not part of her job and had been told that this work was considered part of her job, and despite that Ms. Violette had already ceased performing the commercial strategy work as per Ms. Llopis' instruction.  In connection with the mid-year review, Ms. Llopis stated that Ms. Violette was not good at her job and pressured Ms. Violette to admit the same.

79.     It became apparent that Ms. Violette's concerns surrounding the commercial strategy work she was being required to do, and feeling burnt out as a result, were weaponized against her: not only was she criticized for performing this work in her performance review, but Ms. Luck and Ms. Bijlsma began referring to this matter in conversations regarding the investigation of Ms. Violette's complaint of

discrimination, hostile work environment, and harassment, despite that Ms. Luck was not present during any conversations regarding the scope of Ms. Violette's work, and despite that the scope of Ms. Violette's work was not at all a subject of those conversations.

80.    The October 2024 mid-year review was retaliatory for Ms. Violette's complaints of harassment, hostile work environment, discrimination.

81.    The HR investigation into Ms. Violette's complaints was demonstrably inadequate, failing to interview key witnesses and dismissing substantial evidence of harassment and discrimination. In fact, Ms. Luck even stated to Ms. Violette that Defendants would not be interviewing all employees and would instead be interviewing the female employees in the New York City office to determine whether any other female employees had similar experiences, to which Ms. Violette asked whether Defendants were trying to corroborate her complaints, and Ms. Luck stated that Defendants were not trying to corroborate Ms. Violette's complaints but instead to determine whether "this was happening to anyone else," or words to that effect. However, Defendants failed to interview all female employees, conveniently failing to interview at least two female employees who had experienced sexual harassment and/or sexual assault in the workplace and Defendants also failed to interview any of the male employees whose names Ms. Violette had specifically listed as having witnessed Ms. Violette being sexually harassed and/or being discriminated against. Furthermore, in the interviews that were conducted, a member of management was present, making interviewees feel unable to be forthcoming in their interviews.

82.    On December 5, 2024, Ms. Luck and Ms. Bijlsma informed Ms. Violette that her claims were determined to be "unfounded," without providing any meaningful explanation or addressing the specific incidents she had reported. The company's rationale for dismissing her complaints included (a) asserting that the hostile workplace claim was unfounded because there was no video or written proof of discrimination based on a protected characteristic, despite multiple reported incidents; (b) dismissing the sexual assault claims due to lack of video evidence or eyewitness corroboration, disregarding the nature of such incidents, as many of them occurred during 1:1 meetings and/or were not documented in writing;

and (c) rejecting the sexual harassment allegations on the grounds that no other women in the office had reported similar experiences, ignoring the possibility of underreporting or fear of retaliation. This flawed investigation process failed to adequately address Ms. Violette's detailed accounts, demonstrating a clear bias against Ms. Violette and a failure to properly investigate serious allegations of misconduct, especially because at least two of the incidents Ms. Violette had reported occurred in front of witnesses and/or were contemporaneously disclosed to witnesses, yet Defendants failed to interview the witnesses and/or dismissed the contemporaneous witnesses' corroboration. Defendants further gaslit Ms. Violette, asking her whether *she* had done something to bring this mistreatment on.

83.     Upon information and belief, in reality, women other than Ms. Violette in the office had reported their own experiences of sexual harassment to HR in the past.

84.     Upon information and belief, in "investigating" Ms. Violette's complaint, Defendants were vague and refused to disclose Ms. Violette's name under the guise of protecting her anonymity, effectively hampering their own investigation as the employees interviewed had no way to know the subject matter of the complaint.

85.     During the investigation of Ms. Violette's complaints, Ms. Luck repeatedly pressured Ms. Violette to take mental health leave, Ms. Luck voiced her opinion that Ms. Violette was being subjected to a hostile work environment, and Ms. Luck stated that Ms. Violette would not be retaliated against for doing so. On December 9, 2024, following the dismissal of her complaints, Ms. Violette inquired with Ms. Luck about taking mental health leave due to the severe emotional distress caused by the ongoing harassment and hostile work environment. Although Ms. Luck provided Ms. Violette with an initial email regarding leave, when Ms. Violette responded to Ms. Luck asking questions about the leave process and what information she needed to have her doctor submit, Ms. Luck did not respond, despite Ms. Violette following up.

86.     Ms. Violette requested to take mental health leave as an accommodation for her mental health-related disabilities, including depression, anxiety, and panic attacks.

87.     The persistent harassment and discrimination Ms. Violette experienced caused severe emotional distress with severe physical manifestations: she developed temporomandibular joint ("TMJ") and jaw pain; chronic back, shoulder, and neck pain; chest pains requiring emergency clinic treatment; severe depression, anxiety, and panic attacks requiring psychiatric care; and hair loss and skin problems.

88.     In or around mid-December, just weeks after inquiring about mental health leave, Defendants scheduled a meeting with Ms. Violette for January 3, 2025.  During that meeting on January 3, 2025, less than one month after inquiring about mental health leave, Ms. Violette was terminated from her employment under the pretense of a "layoff," despite being the only employee affected.

89.     The timing and circumstances of Ms. Violette's termination demonstrate clear retaliatory intent, as she was the only employee selected for layoff following her protected activities of reporting sexual harassment, discrimination, and hostile work environment, and requesting reasonable accommodations for her medical conditions.

90.     Upon information and belief, other female employees experienced similar harassment and discrimination while employed by Defendants, establishing a pattern of discriminatory conduct.

91.     Defendants' failure to take appropriate corrective action in response to Ms. Violette's complaints emboldened the harassers and allowed the hostile work environment to persist and escalate.

92.     The severe and/or pervasive nature of the harassment Ms. Violette endured materially altered the terms and conditions of her employment, creating an environment that no reasonable person should be expected to endure.

93.     Defendants' conduct demonstrates a pattern of deliberate indifference to sexual harassment, gender discrimination, and national origin discrimination, as well as retaliation against employees who engage in protected activities.

**AS AND FOR A FIRST CAUSE OF ACTION**
**AGAINST ALL DEFENDANTS FOR SEXUAL HARASSMENT/HOSTILE WORK**
**ENVIRONMENT IN VIOLATION OF TITLE VII**

94.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

95.    At all relevant times, Defendants were "employers" of Ms. Violette within the meaning of Title VII.

96.    By the acts and practices described above, Defendants engaged in unlawful discrimination by creating and maintaining a hostile work environment and subjecting Plaintiff to sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

97.    The sexual harassment and hostile work environment was severe and pervasive, including but not limited to sexual assault, unwanted physical contact, and ongoing verbal harassment.

98.    Defendants knew or should have known of the sexual harassment and hostile work environment but failed to take appropriate corrective action.

99.    Defendants' conduct was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of Plaintiff's rights, entitling Plaintiff to punitive damages.

100.   As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

101.   As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits.


**AS AND FOR A SECOND CAUSE OF ACTION**
**AGAINST ALL DEFENDANTS FOR DISPARATE TREATMENT BECAUSE OF SEX**
**IN VIOLATION OF TITLE VII**

102.   Plaintiff hereby repeats, reiterates and re-alleges each and every allegation contained in

each of the preceding paragraphs as if fully set forth herein.

103.    At all relevant times, Defendants were "employers" of Ms. Violette within the meaning of Title VII.

104.    By the acts and practices described above, Defendants discriminated against Plaintiff in the terms and conditions of her employment on the basis of her sex and/or gender, female, in violation of Title VII.

105.    Defendants subjected Plaintiff to disparate treatment based on her sex, including but not limited to failing to properly investigate her complaints of sexual harassment, and ultimately terminating her employment.

106.    Defendants' purported reason for terminating Ms. Violette is a pretext for sex discrimination.

107.    The temporal proximity between Ms. Violette's complaints of sexual harassment and hostile work environment, and her termination creates a strong inference of discriminatory intent.

108.    Defendants' conduct was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of Plaintiff's rights, entitling Plaintiff to punitive damages.

109.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits.

110.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

**AS AND FOR A THIRD CAUSE OF ACTION**
**AGAINST ALL DEFENDANTS FOR DISABILITY DISCRIMINATION**
**IN VIOLATION OF THE ADA**

111.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

112.    At all relevant times, Plaintiff was a qualified individual with a disability within the meaning of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.

113.    By the acts and practices described above, Defendants discriminated against Plaintiff on the basis of her disability by failing to provide reasonable accommodations and terminating her employment.

114.    Defendants failed to engage in any interactive process regarding Plaintiff's request for mental health leave and other accommodations.

115.    Defendants' conduct was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of Plaintiff's rights, entitling Plaintiff to punitive damages.

116.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the ADA, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits.

117.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the ADA, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**AGAINST ALL DEFENDANTS FOR RETALIATION**
**IN VIOLATION OF TITLE VII**

118.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

119.    Defendants retaliated against Plaintiff, in violation of Title VII of the Civil Rights Act of 1964, because she engaged in protected activity, including but not limited to requesting a reasonable accommodation for her disabilities.

120.    The temporal proximity between Plaintiff's protected activities and her termination creates a strong inference of retaliatory intent.

121.    As a direct and proximate result of Defendants' unlawful retaliation, plaintiff suffered and continues to suffer significant monetary damages, including loss of earnings and other benefits.

122.    As a further direct and proximate result of Defendants' unlawful retaliation, Plaintiff suffered emotional pain, suffering, and other nonpecuniary losses.


### AS AND FOR A FIFTH CAUSE OF ACTION
### AGAINST ALL DEFENDANTS FOR RETALIATION
### IN VIOLATION OF THE ADA

123.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

124.    At all relevant times, Plaintiff suffered from mental health conditions, including severe depression, anxiety, and panic attacks, which substantially limited major life activities and constituted disabilities within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA").

125.    Plaintiff's mental health conditions were caused and/or exacerbated by the severe harassment, discrimination, and hostile work environment she endured during her employment with Defendants.

126.    Plaintiff engaged in protected activity under the ADA by requesting mental health leave as a reasonable accommodation for her disability-related conditions.

127.    Less than one month after Plaintiff's request for reasonable accommodation, Defendants terminated Plaintiff's employment under the pretense of a "layoff," despite Plaintiff being the only employee affected by this alleged reduction in force.

128.   The timing and circumstances of Plaintiff's termination, occurring so shortly after her request for mental health leave, demonstrate a clear retaliatory motive.

129.   Defendants failed to engage in any meaningful interactive process regarding Plaintiff's request for reasonable accommodations, instead choosing to terminate her employment.

130.   By the acts and practices described above, Defendants retaliated against Plaintiff for engaging in protected activity under the ADA, including requesting reasonable accommodations for her mental health conditions.

131.   Defendants' retaliatory conduct was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of Plaintiff's rights under the ADA.

132.   As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the ADA, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including but not limited to loss of past and future income, compensation, and benefits.

133.   As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the ADA, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

134.   Defendants' unlawful retaliatory actions constitute malicious, willful, and wanton violations of the ADA for which Plaintiff is entitled to an award of punitive damages.

## AS AND FOR A SIXTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS FOR NATIONAL ORIGIN DISCRIMINATION
## IN VIOLATION OF TITLE VII

135.   Plaintiff hereby repeats, reiterates and re-alleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

136.   By the acts and practices described above, Defendants discriminated against Plaintiff in the terms and conditions of her employment on the basis of her national origin in violation of Title VII.

137.    Defendants subjected Plaintiff to disparate treatment based on her national origin, including but not limited to subjecting her to different standards than employees of other national origins and creating a hostile work environment.

138.    Defendants' conduct was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of Plaintiff's rights, entitling Plaintiff to punitive damages.

139.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits.

140.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

### AS AND FOR A SEVENTH CAUSE OF ACTION
### AGAINST ALL DEFENDANTS FOR GENDER DISCRIMINATION AND HARASSMENT
### IN VIOLATION OF THE NYSHRL

141.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

142.    By the acts and practices described above, Defendants discriminated against Plaintiff on the basis of her sex/gender in violation of the NYSHRL by subjecting her to disparate treatment, sexual harassment, and a hostile work environment.

143.    Defendants have discriminated against Plaintiff in violation of the NYSHRL by creating, fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or remedy a hostile work environment that included, among other things, severe and pervasive discrimination and harassment.

144.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer monetary and/or economic harm, including

but not limited to loss of past and future income, compensation, and benefits.

145.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering

146.    Defendants' unlawful discriminatory actions constitute malicious, willful, and wanton violations of the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

**AS AND FOR AN EIGHTH CAUSE OF ACTION
AGAINST ALL DEFENDANTS FOR DISABILITY DISCRIMINATION
IN VIOLATION OF THE NYSHRL**

147.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

148.    At all relevant times, Plaintiff was a qualified individual with a disability within the meaning of the NYSHRL, Executive Law §§ 290 et seq.

149.    Plaintiff's disability included, but was not limited to, severe depression, anxiety, and panic attacks requiring psychiatric care and medication, as well as physical manifestations including TMJ and jaw pain, chronic back, shoulder, and neck pain, and other stress-related physical ailments.

150.    By the acts and practices described above, Defendants discriminated against Plaintiff on the basis of her disability and/or perceived disability by: failing to provide reasonable accommodations for her disability; failing to engage in the interactive process regarding her request for mental health leave; and creating and maintaining a hostile work environment that exacerbated her disability.

151.    On December 9, 2024, Plaintiff requested information about mental health leave as a reasonable accommodation for her disability.

152.    Despite Defendants' assurances that there would be no repercussions for taking mental health leave, Defendants terminated Plaintiff's employment on January 3, 2025, less than one month after

her request for accommodations.

153.    Defendants' conduct was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of Plaintiff's rights, entitling Plaintiff to punitive damages.

154.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including but not limited to loss of past and future income, compensation, and benefits.

155.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

### AS AND FOR A NINTH CAUSE OF ACTION
### AGAINST ALL DEFENDANTS FOR NATIONAL ORIGIN DISCRIMINATION
### IN VIOLATION OF THE NYSHRL

156.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

157.    At all relevant times, Plaintiff was a member of a protected class based on her national origin as an American citizen within the meaning of the NYSHRL, Executive Law §§ 290 et seq.

158.    By the acts and practices described above, Defendants discriminated against Plaintiff on the basis of her national origin in violation of the NYSHRL by subjecting her to disparate treatment, hostile work environment, and ultimately terminating her employment.

159.    Throughout her employment, Plaintiff was subjected to discriminatory treatment based on her American national origin, including but not limited to derogatory comments made by Werner Schoeman, Global Head of Marketing, who stated that "Americans are all complainers," that Americans are difficult, argumentative, and stubborn, and during a team offsite made discriminatory remarks stating that Plaintiff is "a difficult person" and that "Americans are difficult and aggressive."

160.    Defendants created and maintained a hostile work environment based on Plaintiff's national origin by subjecting her to different standards than non-American employees and making repeated derogatory comments about her American nationality.

161.    Plaintiff was treated differently than employees of other national origins, including being subjected to aggressive behavior from management, having her work undermined, and facing disparate treatment in terms and conditions of employment.

162.    Team members stated to Ms. Violette that the way Mr. Schoeman treated Ms. Violette was noticeably different than the way Mr. Schoeman treated other team members, further evidencing the disparate treatment Ms. Violette experienced compared to non-American employees.

163.    Defendants' conduct was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of Plaintiff's rights, entitling Plaintiff to punitive damages.

164.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including but not limited to loss of past and future income, compensation, and benefits.

165.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

## AS AN FOR AN ELEVENTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS FOR FAILURE TO ACCOMMODATE
## IN VIOLATION OF THE NYSHRL

166.    Plaintiff repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

167.    The acts that constitute and form this cause of action were perpetrated upon Plaintiff while she was in the course of her employment with Defendants and while she was protected under the

26

NYSHRL.

168.    The facts contained herein constitute Defendants' failure to accommodate the Plaintiff's disability.

169.    The NYSHRL, N.Y. Exec. Law § 296(3), makes it an unlawful discriminatory practice for an employer to refuse to provide reasonable accommodations for the known disabilities of an employee.

170.    At all relevant times, Plaintiff was a qualified individual with a disability within the meaning of the NYSHRL.

171.    Plaintiff's disability included severe depression, anxiety, and panic attacks requiring treatment, as well as physical manifestations caused by the ongoing harassment, discrimination, and hostile work environment she experienced during her employment.

172.    On December 9, 2024, Plaintiff requested information about mental health leave as a reasonable accommodation for her disability.

173.    Defendants knew of Plaintiff's disabilities and her requests for reasonable accommodations, including taking leave, to enable her to continue performing the essential functions of her job.

174.    The requested accommodations were reasonable and would not have imposed an undue hardship on Defendants.

175.    Defendants failed and refused to provide Plaintiff with any reasonable accommodations for her disability, including the mental health leave.

176.    Despite HR's assurances that there would be no repercussions for taking mental health leave, Defendants terminated Plaintiff's employment on January 3, 2025, less than one month after her request for accommodations, demonstrating their discriminatory animus toward her disability and request for accommodations.

177.    Defendants unlawfully failed and refused to provide Plaintiff with a reasonable accommodation for her disabilities and failed to engage in a good-faith interactive process to determine an appropriate accommodation.

178.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of monetary damages and other relief.

179.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

180.    As a result of Defendants' violations of the NYSHRL, Plaintiff has been damaged in a sum that exceeds the jurisdiction of all lower courts.

### AS AN FOR AN TWELFTH CAUSE OF ACTION
### AGAINST ALL DEFENDANTS FOR RETALIATION
### IN VIOLATION OF THE NYSHRL

181.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

182.    By the acts and practices described above, Defendants retaliated against Plaintiff for engaging in protected activity under the NYSHRL.

183.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer monetary and/or economic harm, including but not limited to loss of past and future income, compensation, and benefits.

184.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

185.    Defendants' unlawful retaliatory actions constitute malicious, willful, and wanton violations of the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

## AS AND FOR AN THIRTEENTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS FOR GENDER DISCRIMINATION AND HARASSMENT
## IN VIOLATION OF THE NYCHRL

186.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

187.    By the acts and practices described above, Defendants discriminated against Plaintiff on the basis of her sex/gender in violation of the NYCHRL by subjecting her to disparate treatment, sexual harassment, and a hostile work environment.

188.    Defendants have discriminated against Plaintiff in violation of the NYCHRL by creating, fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or remedy a hostile work environment.

189.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered and continues to suffer monetary and/or economic harm, including but not limited to loss of past and future income, compensation, and benefits.

190.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, the impact for which she felt in New York City.

191.    Defendants' unlawful discriminatory actions constitute malicious, willful, and wanton violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

**AS AND FOR A FOURTEENTH CAUSE OF ACTION
AGAINST ALL DEFENDANTS FOR DISABILITY DISCRIMINATION
IN VIOLATION OF THE NYCHRL**

192.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

193.    At all relevant times, Plaintiff was a qualified individual with a disability within the meaning of the NYCHRL, Administrative Code §§ 8-101 et seq.

194.    By the acts and practices described above, Defendants discriminated against Plaintiff on the basis of her disability and/or perceived disability in violation of the NYCHRL by subjecting her to disparate treatment, failing to provide reasonable accommodations, and terminating her employment.

195.    Defendants have discriminated against Plaintiff in violation of the NYCHRL by creating, fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or remedy a hostile work environment that exacerbated her disability and by failing to provide reasonable accommodations including mental health leave.

196.    Defendants' failure to engage in the interactive process regarding Plaintiff's disability and request for reasonable accommodations violates the NYCHRL.

197.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered and continues to suffer monetary and/or economic harm, including but not limited to loss of past and future income, compensation, and benefits.

198.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, the impact for which she felt in New York City.

199.    Defendants' unlawful discriminatory actions constitute malicious, willful, and wanton violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

## AS AND FOR A FIFTEENTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS FOR NATIONAL ORIGIN DISCRIMINATION
## IN VIOLATION OF THE NYCHRL

200.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

201.    At all relevant times, Plaintiff was a member of a protected class based on her national origin as an American citizen within the meaning of the NYCHRL, Administrative Code §§ 8-101 et seq.

202.    By the acts and practices described above, Defendants discriminated against Plaintiff on the basis of her national origin in violation of the NYCHRL by subjecting her to disparate treatment, hostile work environment, and terminating her employment.

203.    Defendants have discriminated against Plaintiff in violation of the NYCHRL by creating, fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or remedy a hostile work environment based on her American national origin, including repeated derogatory comments and disparate treatment.

204.    The discriminatory treatment based on Plaintiff's national origin was part of a broader pattern of hostile behavior by Defendants and materially affected Plaintiff's working conditions, creating an environment that no reasonable person should be expected to endure.

205.    During company events, Plaintiff experienced negative sentiments from European colleagues regarding her American nationality, which contributed to her feeling uncomfortable seeking assistance during instances of harassment and discrimination.

206.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered and continues to suffer monetary and/or economic harm, including but not limited to loss of past and future income, compensation, and benefits.

207.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered and continues to suffer severe mental anguish and

emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, the impact for which she felt in New York City.

208.   Defendants' unlawful discriminatory actions constitute malicious, willful, and wanton violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

### AS AND FOR A SIXTEENTH CAUSE OF ACTION
### AGAINST ALL DEFENDANTS FOR FAILURE TO ACCOMMODATE
### IN VIOLATION OF THE NYCHRL

209.   Plaintiff repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

210.   The acts that constitute and form this cause of action were perpetrated upon Plaintiff while she was in the course of her employment with Defendants and while she was protected under the NYCHRL.

211.   The facts contained herein constitute Defendants' failure to accommodate the Plaintiff's disabilities.

212.   The NYCHRL, N.Y.C. Admin. Code § 8-107(22), makes it an unlawful discriminatory practice for an employer to refuse or otherwise fail to provide a reasonable accommodation for the needs of an employee for the employee's disability that is known or should have been known by the employer.

213.   At all relevant times, Plaintiff was a qualified individual with a disability within the meaning of the NYSHRL.

214.   Plaintiff's disability included severe depression, anxiety, and panic attacks requiring treatment, as well as physical manifestations caused by the ongoing harassment, discrimination, and hostile work environment she experienced during her employment.

215.   On December 9, 2024, Plaintiff requested information about mental health leave as a reasonable accommodation for her disability.

216.   Defendants knew of Plaintiff's disabilities and her requests for reasonable accommodations,

including taking leave, to enable her to continue performing the essential functions of her job.

217.    The requested accommodations were reasonable and would not have imposed an undue hardship on Defendants.

218.    Defendants failed and refused to provide Plaintiff with any reasonable accommodations for her disability, including the mental health leave.

219.    Despite HR's assurances that there would be no repercussions for taking mental health leave, Defendants terminated Plaintiff's employment on January 3, 2025, less than one month after her request for accommodations, demonstrating their discriminatory animus toward her disability and request for accommodations.

220.    Defendants unlawfully failed to provide reasonable accommodations to Plaintiff and failed to engage in the required cooperative dialogue to assess her needs and the feasibility of any potential accommodations under the NYCHRL.

221.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of monetary damages and other relief.

222.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief, the impact for which she felt in New York City.

223.    As a result of Defendants' violations of the NYCHRL, Plaintiff has been damaged in a sum that exceeds the jurisdiction of all lower courts.

224.    The acts perpetrated on Plaintiff were committed by Defendants with reckless indifference in the face of a perceived risk that its actions would violate Plaintiff's protected rights under the NYCHRL, so that, in addition to the damages inflicted upon Plaintiff, and in addition to all other measures

of relief to which Plaintiff may be properly entitled herein, Defendants should also be required to pay punitive damages for their discriminatory conduct in order to deter Defendants, and others similarly situated from engaging in such conduct in the future.

225.    Defendants' unlawful discriminatory actions constitute malicious, willful, and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages against each Defendant.

## AS AND FOR A SEVENTEETH CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR RETALIATION IN VIOLATION OF THE NYCHRL

226.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

227.    By the acts and practices described above, Defendants retaliated against Plaintiff for engaging in protected activity under the NYCHRL.

228.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered and continues to suffer monetary and/or economic harm, including but not limited to loss of past and future income, compensation, and benefits.

229.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, the impact for which she felt in New York City.

230.    Defendants' unlawful retaliatory actions constitute malicious, willful, and wanton violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court award:

(a)    Compensatory damages, including damages for lost wages, emotional distress and mental anguish, in favor of Plaintiff in an amount to be determined at trial;

(b)    All damages afforded to Plaintiff based on the allegations contained in the Complaint;

(c)    Punitive damages in favor of Plaintiff in an amount to be determined at trial;

(d)    Costs, interest, expert fees and attorneys' fees; and

(e)    Such other and further relief as this Court may deem just and proper.


Dated: December 9, 2025

RISMAN & RISMAN, P.C

By: *Shannon Barry*

Shannon Barry, Esq.
Jeffrey Risman, Esq.
233 Broadway, Suite 2707
New York, New York 10279
(212) 233-6400
*Counsel for Plaintiff*

35